PER CURIAM.

(No. 6130—Claimant

AL JOHNSON CONSTRUCTION CO., and MASSMAN CONSTRUCTION CO., d/b/a AL JOHNSON-MASSMAN, Claimant, *vs.* STATE OF ILLINOIS, Respondents.

*Opinion filed June 24, 1974.*

SORLING, CATRON AND HARDIN, AND CARLSEN, GREINER AND LAW, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

BURKS, J.

Claimants in this action seek damages from the State in the amount of $477,894.93. The claim is found upon a contract entered into on June 20, 1967, by and between the respondent and the claimants for bridge pier construction work which was to be performed and which was performed by the claimants.

The issues involved are primarily questions of fact.

Al Johnson Construction Company of Minneapolis,

Minnesota, and the Massman Construction Company of Kansas City, Missouri, engaged in a joint venture under the trade name and style of Al Johnson-Massman, [hereinafter referred to as "contractor" or "claimants"] for the purpose of bidding on a contract with the State of Illinois, [hereinafter referred to as the "State" or "respondent"] of a substructure of a highway bridge over the Illinois River at Hennepin, [hereafter, "Hennepin Bridge"].

This job was officially known as "Federal Aid Interstate Route No. 180, Project No. 1-180-7(5)0, Sec. (06-3, 78-1)B, in Bureau-Putman Counties, bridge substructure, Contract No. 25074".

The substructure of the bridge, the subject matter of this contract, consisted of 14 reinforced concrete piers, with abutments on the east and west banks of the Illinois River. These piers were to support a steel superstruction (the roadway portion of the bridge) which would be erected by others under separate contracts.

The State retained Alfred Benesch and Company [hereafter "Benesch"] of Chicago, as design engineer and consultant.

Benesch is an experienced bridge engineer, and the Contractor has over 40 years experience in the heavy construction business.

Early in 1967, the State informed Benesch that it needed a complete design of the Hennepin Bridge within four months so that the bridge could be opened to traffic within a year and a half. Benesch advised the State that it was impossible to procure a complete design in four months, but that it was feasible to have both design and construction completed in a year and a half. Benesch believed that this could be accomplished if the job were

bid on preliminary drawings and the final plans furnished as the job progressed after the contract was awarded. It was decided to let the job out for bids on this basis.

In its plans to stimulate the economic development of the Hennepin area, the State had embarked upon the project of constructing a four-lane pavement, including the bridge in question, to an area close to a site where the Jones and Laughlin Steel Company was to place a large plant.

Prior to the opening of the bids, the Contractor had received a letter from the respondent stating this project had been given high priority by the Governor; that the construction had been placed on an expedited schedule; and that, while the Division of Highways would continue to expend every effort to help the Contractor, the completion date must be met.

In order to construct this bridge in the shortest possible time, it was decided to allow the bid to be let on the basis of preliminary typical detailed plans on a unit cost basis, and to furnish the final plans as the work progressed in accordance with a "critical path" to be followed by the contractor and the bridge designer.

Bids were opened on May 26, 1967, and the contract awarded to the claimants, the low bidder, for their bid price of $2,342,186. The contract called for a completion date of April 1, 1968, and provided for liquidated damages of $2,000 per day for late completion.

This job was unusual in that it was the first time the Contractor had bid a job for a governmental agency based upon preliminary plans. It was also the first time the State of Illinois had let a bridge job out for bids without having first completed final construction draw-

ings. [At this point, the court takes notice that this unusual feature of the contract distinguishes the case at bar to some extent from *Illinois Steel Bridge Company* v. *State,* 7 C.C.R. 75, cited in respondent's brief.]

The work included in this contract was for the construction and removal of temporary cofferdams;* excavation; furnishing and driving steel and timber piles; construction of embankments at abutments; and the construction of piers and abutments. The bidding drawings called for the construction of 14 piers. Pier No. 1 was the easterly pier and pier No. 14 was the westerly pier. The documents which the Contractor relied upon in preparing its bid are shown in claimants' exhibits, numbered and tilted as follows: 1. "Bidding Drawings"; 2. "Standard Specifications for Road and Bridge Construction of the State of Illinois"; 3. "Supplement Specifications" revising said Standard Specifications; and 4. "Notice to Bidders, Specifications, Proposal, Contract, and Contract Bond".

Included in claimants' last mentioned Exhibit 4, was a schedule showing the time (dates) within which the bid plans were to be prepared, the contract awarded, the final plans furnished, and the sequence of construction of the piers for the substructure.

The schedule called for the east and west abutments to be placed first, by the middle of August, 1967. It then called for simultaneous construction of piers 1 and 2 on the east bank of the river, and piers 12, 13, and 14 on the west bank of the river. These piers were to be completed by November 15, 1967. The middle piers of the bridge, piers 3 through 11, were to be constructed last, and were

---

*A cofferdam is a watertight temporary structure placed in the river for keeping the water from an enclosed area that has been pumped dry so that bridge foundations, piers, may be constructed.

to be completed by April 1, 1968.

We think it is safe to say nothing went according to schedule. Each side blamed the other for the problems that arose almost immediately. The last major work item was not completed until August 26, 1968, and the contractor was still in minor clean-up work as late as November, 1968.

Without attempting at this point to assign reasons, or to place blame, it can be noted that the building of the piers proceeded so slowly that as of April, 1968, when all work on the substructure was supposed to have been completed, the six tallest piers, 1 through 6, were still not completed. All reinforced concrete was not in place until Agust, 1968, when the last two piers were finished. This was nearly 5 months after the final completion date in the original contract.

We have lifted the following comments from the "Departmental Report" by R. D. Schmidt, Engineer of Construction, Department of Public Works & Buildings, Division of Highways:

"Contractor failed to mobilize promptly, move in and commence the work after the contract was awarded on May 26, 1967, On June 13, 1967, Contractor advised that its equipment would be moved in starting next week. No major items of equipment arrived until July 1, 1967, when 4 barges arrived.

The unloading began on July 5, 1967, but, it was several days after that before the equipment was assembled and ready to perform work.

In order to get equipment and materials to the construction area on the west side of the river, the Contractor built a haul road northerly from Illinois Route 71 to that area. The building of that road started on July 12, 1967. On July 18, 1967, Mr. Forbeck and his attorney advised Claimants' foreman not to cut any trees on his land. [Note: Title to Forbeck land had not then been acquired by the State.] Claimants proceeded with building the haul road without going onto the Forbeck property. Building of the haul road continued until August 28, 1961." Page 2.

"After 69 days had elapsed since the award (22% of the completion time) the percentage of work in place was zero. On 40 of the 69 days no work was recorded. Nearly 2 months later when 49% of the contract allowable time had elapsed, 27% of the work was in place, 153 days after the award. . . . ."

"The Contractor completed about 55% of the work by April 1, 1968, a contract time of 311 calendar days. The remaining 45% of the work was done in 151 days." Page 3.

The State's principal responsibility under the contract was to furnish the contractor with approved designs for the piers, so that the contractor could place timely orders for the necessary quantities of reinforcing steel and have the piers built within the contractual time schedule. Respondent's Exhibit 12 shows the dates on which the contractor received from the State constructions plans marked "Not Final", approved construction plans, and the dates on which the plans had been scheduled for delivery. Again, without attempting at this point to assign reasons or to fix blame, we find that the State did not adhere to its schedule in every instance. We find that with reference to piers 12, 13, and 14, although the final plans were due August 1, 1967, they were not received by the contractor until November 8, 1967, October 2, 1967, and September 25, 1967, respectively. We find that, although plans for pier 1 were due August 1, 1967, the contractor received so-called "final" plans for the pier on three different dates, the last revision being dated October 2, 1967. The contractor also received so-called "final" plans for pier 7 on three different occasions: August 10, 1967, September 7, 1967, and September 28, 1967, although under the original scheduling the State was not required to submit the plans for pier 7 until November 1, 1967.

Another duty of the State was to approve the contractor's cofferdam designs. Respondent's Exhibit 11 is a schedule of the dates claimant submitted its cofferdam designs to the State for approval, the dates on which the State returned the designs for corrections, and the dates of final approval. Even without reading the 66 pages of correspondence between claimants and Benesch, some of

it angry, it appears on the face of respondent's Exhibit 11 that claimants experienced a great deal of difficulty in obtaining approval of their cofferdam designs.

From the material covered thus far, we have pointed out that there arose areas of dispute and complaint between the parties during the course of the performance of the contract. We have only touched on three. There are several others. At this point it is more meaningful to discuss the further facts in connection with the issues in the case.

The case, at first blush, appears to be tremendously complex. The voluminous record seems to forbid careful analysis. However, we find that the claims for damages can be summarized succinctly, and that it then becomes intelligible to discuss the legal and factual issues in terms of claimant's ad damnum. These claims fall into 3 major categories with some sub-categories as follows:

I. Damage due to the failure of the State to grant an extension of construction time because of delays beyond the control of claimants.

 A. Delay of the State in securing title to the land under piers 12, 13, and 14. [The Forbeck property.]

 1. Causing claimants to change its construction plan;
 2. Depriving claimants of 55 construction days;

 B. Delay of the State in supplying construction drawings of piers 1, 5, 7, and 10 on time;

 C. Said delays in securing right of way and in furnishing drawings causing monetary damage to claimants as follows:

 1. Cost of complying with wrongfully issued acceleration directives . . . . . $123,172.00
 2. Cost from delay in receiving final reinforcing steel drawings . . . . . . . 72,456.26

 Total damages caused by State's delays. . . . . . . . . . . . . . . . . . . . . . . $195,628.26

II. Damages due to alleged material variations by lhe State of the original plans and specifications, with respect to:

 A. Design change in re-inforcing steel in pier stems.

 1. Substantially increasing the amount of re-inforcing steel required in larger piers;

 2. Detailing the increase in an unusual manner so as to prevent the prefabrication of the steel;

 3. Causing monetary damage as follows:

| | |
|---|---:|
| (a) Additional cost of reinforcing steel placement.................... | $119,807.30 |
| (b) Additional cost of Class X concrete placement.................... | 64,025.35 |
| (c) Additional cost of dewatering cofferdams....................... | 31,425.87 |
| Total damages caused by design change in reinforcing steel ....... | $215,258.52 |

 B. Changing the size of the footings for the piers from two in the original plans to five in the construction drawings.

 1. Necessitating an increase in the size of the cofferdams;

 2. Requiring more seal coat;

 3. Causing monetary damages as follows:

| | |
|---|---:|
| (a) Additional cost due to net enlargement of cofferdams............. | $ 22,259.14 |
| (b) Additional cost due to non-pay excavation in cofferdams............ | 2,704.77 |
| (c) Additional cost of non-pay seal coat concrete in cofferdams .......... | 16,829.68 |
| Total damages caused by changing size of footings ............... | $ 41,793.59 |

III. Claim for retainage not in dispute. Respondent concedes that this amount is owed to claimants. This payment was withheld by the respondent because of

claimants refusal to accept a "final" ac-
counting . . . . . . . . . . . . . . . . . . . . . . . $ 25,214.56

Summary of damages claimed:

| | |
|---|---|
| $195,628.26 | Damages due to delays by the State. |
| 215,258.52 | Damages due to design change in reinforcing steel. |
| 41,793.59 | Damages due to changes in sizes of footings. |
| 25,214.56 | Retainage |

$477,894.93 Total claim

Respondent's answer to claims I and II are simple enough. Respondent contends that the delays on the part of the State, complained of under I, even if admitted, did not cause claimants any damage because claimants were not prepared to go ahead with the work; and that the changes complained of in II did not constitute a material variation of the contract.

The issues will be discussed according to the outline set forth above.

I. Damage due to failure of the State to grant an extension of construction time because of delays beyond the control of the claimant.

 A. Delay of the State in securing title to the land under piers 12, 13, and 14, and the west abutment.

On June 6, 1967, a preconstruction meeting was held at the District Highway Office Building in Dixon to review constructions details. At this meeting the State

revealed that it had not as yet acquired the right-of-way to certain land inland from the west bank of the Illinois River, known as the Forbeck property, and that it would not have the right of way to this property until about August 1. The Forebeck property included the land on which would be constructed the west abutment, pier 14, most of pier 13, and part of pier 12.

The subject of the Forbeck property consumes a substantial part of the record, and claimants regard it as a major portion of their case. However, we believe it can be stated categorically that all of claimants' claims with respect to alleged damages caused by delay on the part of the Senate in acquiring right-of-way over the Forebeck property are without foundation. The simple reason is that, as of July 31, 1967, when the State obtained access to the Forbeck property, claimants had not yet brought their haul road on the western side of the river to Mr. Forbeck's property line. We quote again from the "Departmental Report" (Supra) at page 2: [Information based on the diaries of the State's resident engineer, Mr. Becker.]

"In order to get equipment and materials to the construction area on the west side of the river, the Contractor built a haul road northerly from Illinois Route 71 to that area. The building of the road started on July 12, 1967. On July 13, Mr. Forbeck and his attorney advised claimants' foreman not to cut any trees on his land. Claimants proceeded with building the haul road without going onto Mr. Forbeck's property . . .

"Mr. Forbeck agreed to allow the State and its contractor access on July 31, 1967, and the Contractor was so advised August 2, 1967. *On August 2, 1967, the haul road had not been built to the property line of Mr. Forbeck nor did the claimants have available the equipment to remove the unsuitable material on the Forbeck property. That equipment arrived August 23, 1967, by barge* . . .

"Building of the haul road continued to August 28, 1967. Removal of unsuitable materials under the west abutment began on August 25, 1967 . . . (Dept. Rept. p. 2).

Upon learning at the preconstruction meeting, June 6, 1967, that the State did not have title to the Forbeck

property, claimants concluded that the bridge piers could not be constructed in the sequence set forth in the Notice to Bidders, and requested that they be allowed to re-schedule the work so as to start on piers 1, 5, 7, and 10. The State acquiesced, and Benesch agreed to design the piers according to the new construction schedule. Seen in retrospect from the vantage point of the record, this change, although agreed to by the State, was not needed and accomplished nothing.

The matter can be explained in this way: The east and west abutments were intially to be finished as of August 15, 1967. Final plans for the abutments, owed to the contractor by the State as of June 1, 1967, were in his hands by June 29, 1967. As of August 23, 1967, [eight days after the abutments were to be completed] the equipment needed to haul away unsuitable material in the area of the west abutment, before construction could begin there, had just arrived by barge. Excerpts from entries in the Resident Engineer's Diary for August 21, 24, 25, 1967, show:

Aug. 21: (Late PM) Luhr & Co. tied up two barges near pier 6. They have two large crawler cranes to unload and walk back to start removing unsuitable material . . .

Aug. 24: Luhr & Co's large crane broke down west of No. 7 on the haul road . . .

Aug. 25: Luhr & Co. started to remove unsuitable material for Al Johnson . . .

As of September 13, 1967, a month after the west abutment should have been completed, the contractor finally finished the job of hauling away unsuitable material. The report of the Resident Engineer for the week ending September 13, 1967 states:

"Completed excavation of unsuitable material at west approach acd continued placing porous granular embankment for west approach."

Under the initial schedule, piers 12, 13, and 14 were

to have been finished as of November 15, 1967. Claimants initial "critical path" required them to start construction of the cofferdam for pier 14 on July 11, 1967. [Cl. Ex. 39 B] As pointed out above, claimants didn't start the haul road to get to the site where the cofferdam would have to be built until July 12, 1967. As of July 18, 1967, one week later, they should have been starting to build the cofferdam for pier 12 [Cl. Ex. 39 B]. At that point *they did not even have the equipment on hand to build two cofferdams simultaneously.* Dairy of Resident Engineer. Entry for July 20, 1967.

"Contractor has another crane on railroad somewhere, long overdue. They need it now so work can start on more than one cofferdam."

On August 23, 1967, when they should have been taking the cofferdam from pier 14 to be used at pier 13 [Cl. Ex. 39 B], their equipment had just arrived by barge to start the basic hauling away of unsuitable material.

The evidence is clear that claimants suffered no damages from the State's delay in acquiring access to the Forbeck property, because claimants were totally unprepared to build the west abutment and piers 12, 13, and 14, according to the original schedule. This fact is visibly substantiated by a photo exhibit in the record [Resp. Ex. 3, 1277-0-34]. This is a large blowup of an aerial photograph taken on August 14, 1967, with the outline of the Forbeck property superimposed. In this photo, which was taken fourteen days after the State had access to the Forbeck property, the haul road, plainly visible, still had not moved inland from the river to a point where the contractor could have worked on the west abutment and piers 12, 13, and 14, which are on the Forbeck property.

B. Delay of the State in supplying construction drawings of piers 1, 5, 7, and 10 on time.

The new sequence of construction requested by

claimants immediately following the preconstruction meeting of June 6, 1967, called for the contractor to start on piers 1, 5, 7, and 10, instead of piers 1, 2, 12, and 14. It should be noted that both sequences called for the construction of pier 1 [a water pier] and merely substituted land piers 7 and 10 for land piers 12 and 14; and water pier 5 for water pier 2. Both sequences called for the contractor to purchase enough material for 4 cofferdams so that 4 piers would be under construction at one time and with a crane working each cofferdam and pier.

Claimants contend that they lost 51 days in their schedule because of the delays in receiving final drawings for pier 1. Without discussing, at this point, the reasons for the State's difficulties with the design of pier 1, it will suffice to say that the State sent the contractor so-called "final" drawings for pier 1 on August 17, 1967. Again on September 7, 1967, and again on October 2, 1967. The last dated set were the drawings from which the pier was built. On page 25 of the "Statement of Facts" section of claimants' brief, claimants state specifically that they are not making claim for the alleged delays in receipt of drawings for the other piers since the delay at the other piers ran concurrently with the delay at pier No. 1, "the critical pier on the job during the time the drawings were delayed".

On pages 22 and 23 of the "Argument" section of their brief, claimants explain how their claim for 51 days delay was computed, and state:

"The key date in determining the duration of this delay is September 1, 1967, the date the deal coat for pier 1 was poured. Pier 1 was the critical pier. *After the seal coat is poured the re-steel for the footing can be placed.* This steel must be on the job site at that time or the work will be delayed. It takes 2 to 3 weeks for the steel to be fabricated and delivered to the job site after the steel supplier receives the drawings. [emphasis added]

"There are 2 ways of computing the delay in this case:

"(1) The seal coat was poured on September 1, 1967. It takes 2 days to

cure the seal coat. In order for the steel coat to be on the job site when needed, final drawings would have to be in the hands of the supplier 2 to 3 weeks prior to that date. Mr. Wolf used August 15, 1967. Final drawings were not received until October 2, 1967. The duration of the delay is the number of days between when the drawings should have been received in order to avoid delay and when they were actually received.

"(2) The seal coat was poured on September 1, 1967. The steel should have been on the job on that date. The steel was not actually received until October 19, 1967, because final drawings were not received until October 2, 1967. The duration of the delay was from September 1, 1967, to October 19, 1967.

"Depending on how the days are counted and what judgments are used, there was a delay of some 48 to 51 days. The Contractor used 51 days in measuring its claim for delay in the sum of $74,245.26. [Cl. Ex. 41]"

The fallacy in claimants' arguments is disguised in the following sentence from their first paragraph: "After the seal coat is poured the re-steel for the footing can be placed". This completely overlooks the fact that conditions within the cofferdam at pier 1 were such that the *form* for the pier footing was not finally set until October 30, 1967, and that the first reinforcing steel was not introduced into the form until the following day, October 31, 1967. [This is confirmed by the excerpts from the Resident Engineer's diary excerpted as to pier 1 and attached to respondent's brief.]. But, as claimants tell us in their brief, they had had the steel on hand since October 19, 1967.

Here again, granting that the State failed to come forth with "final" final plans for pier 1 until October 2, 1967, it was on October 31, 1967, when the claimants were, for the first time, ready to use the reinforcing steel. They had it on hand, and suffered no damage by not being able to order it prior to October 2, 1967. Their claim of 51 days loss of time is totally without merit.

The final plans for pier 5 were delivered to claimants on October 10, 1967. Yet, on October 31, 1967, they were still pumping water out of the cofferdam. [Resident En-

gineer's diary, excerpted as to pier 5, and attached to Resp. Brief.] As of March 1, 1968, claimants started putting rebars in the footing.

Only with reference to pier 7 was there an occasion when the delay in receiving final drawings delayed their obtaining steel so that claimants had to shut down work on the pier. Otherwise, claimants were at all times so far behind in their schedule, in large part because of problems with their cofferdams, that the delay in receiving final drawings was of not more consequence than the delay in acquiring the right-of-way to the Forbeck property.

C. Alleged monetary damages arising from alleged delays.

For the same reasons set forth above, the Court finds that the claim for $72,456.26 alleged to be lost from delays in receiving reinforcing steel drawings should be denied.

The Court also finds that the claim for $12,172.00 alleged to be the additional cost of complying with wrongfully issued acceleration directives should be denied, and explains its view of the matter as follows:

On August 28, 1967, October 6, 1967, and November 1, 1967, the State demanded that the contractor accelerate his work. [Cl. Ex. 18a]. In claimants' Brief ["Statement of Facts", page 21], they state;

"In early November, 1967, the Contractor did accelerate the work by purchasing another cofferdam and renting two additional barges, two additional cranes, material barges, and worked overtime, and on Saturdays and Sundays."

Claimants then go on to say:

"At the time that the State ordered acceleration of the work on November 3, 1967, the Contractor was entitled to time extensions due to delay in securing

right-of-way and due to delay in receipt of drawings. If time extensions for these two delays had been granted by the State, the Contractor would not have been behind schedule and any direction by the State to accelerate the work would have been wrongful. Subsequent to November 1, 1967, the job site was *flooded* five times on the following dates:

November 1, 1967 through November 12, 1967
December 11, 1967 through January 24, 1968
January 30, 1968 through February 15, 1968
February 16, 1968 through March 1, 1968
June 25, 1968 through July 18, 1968

"After each flood duration was determined, the Contractor made timely requests for time extensions but received no prompt answer from the State either granting or denying time extensions.

"The Contractor continued to pursue the work on an accelerated basis from November, 1967 through the end of the job. As a result of this. [claimants] incurred increased costs which they would not have incurred had the State not wrongfully directed the Contractor to accelerate . . .

"On April 8, 1968, the State granted the Contractor a 74 day time extension because of floods up to February 15, 1968. On May 13, 1968, the State granted Contractor a 10 day extension because of floods, and on September 23, 1968, after the job had been completed, granted another 14 day time extension because of floods. [Cl. Ex. 40B]. On October 23, 1968, the State granted Contractor a 15 day time extension because of its delay in securing the right-of-way at the beginning of the job. [Cl. Ex. 40C]

"On December 13, 1968, the State granted Contractor a 34 day time extension to the contract, extending the completion date of the contract to August 26, 1968, the actual date of completion [Cl. Ex. 40 I]. No specific reason for this time extension was given. No liquidated damages were assessed."

The crux of claimants' position is contained in the following sentences which are requoted for emphasis:

"At the time that the State ordered acceleration of the work on November 3, 1967, the Contractor was entitled to time extensions due to delay in securing right-of-way and due to delay in receipt of drawings. If time extension for these two delays had been granted by the State, the Contractor would not have been behind schedule and any direction by the State to accelerate the work would have been wrongful."

We have held that the preponderance of the evidence supports our finding that claimants were not entitled to any time extensions due to delays insecuring right-of-way, nor due to delays in receipt of drawings. This is true even though on October 23, 1968, the State saw fit to grant a 15 day extension because of its delay in securing right-of-way, and on December 13, 1968, saw fit to grant

an additional 34 day extension, for no assigned reason, extending the completion date of the contract to August 26, 1968, which was the actual completion date.

It is claimants' contention, however, that if all such requests for extensions had been granted, they could have finished the job on *September 30, 1968,* without acceleration; [Cl. Ex. 39 F]; that they should have been allowed to finish the job without accelerating; and that finishing the job on August 26, 1968 rather than on September 30, 1968, cost them an additional $123,172.00. We find that this claim is without merit and should be denied.

II. Damages due to alleged material variations by the State of the original plans and specifications with respect to:

A. Design change in reinforcing steel in pier stems.

1. Substantially increasing the amount of reinforcing steel required in larger piers;

2. Detailing the increase in an unusual manner so as to prevent the prefabrication of the steel.

We find considerable merit in this portion of claimants' cause. As previously stated, this was the first time the State of Illinois had let a bridge job out for bids without having first completed final construction drawings. Claimants summarize their view of the State's changing designs in mid-stream, so to speak, by the following statement in their brief:

The State wanted a rush job. It received a rush design job from its engineer. The design was determined to be inadequate after the contract had been entered into and after some of the piers had been designed and approved. The State now claims that the Contractor should be the one to bear the loss of increased costs. The State followed the directions of the U.S. Bureau of Public Roads, over which the Contractor had no control; accepted the suggestions of Benesch as to redesign, over vhich the Contractor had no control; and received the benefit of a better designed bridge. To the extent that the State has received a better bridge without incurring the additional cost in connection therewith, the State is unjustly enriched."

The State's unusual procedure of letting the job out for bids without having first completed final construction drawings, was reflected in the language on page 6 of the Special Provisions [Cl. Ex. 4]:

"Plans. The drawings listed below show the span arrangements, general dimensionu, typical details, borings and various other information for bidding purposes only and will form a part of the contract. *The plans will be supplemented with final construction plans as they are completed in accordance with the Schedule of Design and Construction.* As shown in the schedule it is intended to issue the final plans for construction in several stages for various parts of the project rather than issue drawings covering the entire project at one time."

"The Contractor shall understand that the quantities on the bidding plans may be increased or decreased on the construction plans and there will be no adjustment to the unit bid prices of the contractors from the bidding plans or any additional compensation allowed for any changes as stated herein." |Cl. Ex. 4. page 6].

Further, in the proposal submitted by claimants, they subscribed to the following language:

"6. The undersigned declares that [the Contractor] understands that the quantities mentioned are approximate only and that they are subject to increase or decrease; that he will take in full payment therefor the amount of the summation of actual quantities, as finally determined, multiplied by the unit prices shown in the schedule of prices contained herein . . .

"8. The undersigned further agrees that, if the Engineer decides to extend or shorten the improvement or otherwise alter it by additions or deductions, including the elimination of any one or more of the items, he will perform the work as altered, increased, or decreased, at the contract unit prices. [Cl. Ex. 4, Proposal]."

As pointed out by claimants in their brief, however, the right of the State to increase or decrease quantities without incurring damages beyond the unit price is not unlimited. The Supplemental Specifications to the Standard Specifications for Road and Bridge Construction [Cl. Ex. 3] provides:

"Section 4. Scope of the Work.

4.3 ALTERATIONS, CANCELLATIONS, EXTENSIONS AND DEDUCTIONS. In order that the work may be completed in a satisfactory manner, the Department reserves the right to alter plans, extend or shorten the improvement, add

such incidental work as may be necessary for the satisfactory completion of the work, deduct or cancel one or more of the unit price items and increase or decrease the quantities of work to be performed to accord with such changes, *provided that the changes are not of such magnitude as to constitute a substantial or material variation in the original contract."*

When claimants bid on the contract, they assumed from the preliminary drawings that they would be able to prefabricate the reinforcing steel. This means that they would prefabricate the steel for the pier footings, stems, pedestals, and caps into "cages" on the banks of the river; transport the prefabricated cages out to the pier by barge; lower them into the forms and pour the concrete. It seems obvious to the court that this would provide a substantial savings over employing iron workers to place and tie the bars up in the air and within the confinement of the forms. The prefabrication plan for the reinforcing steel was reflected in the unit price of 17 cents per pound in claimants' bid. [Tr. 41; Cl. Ex. 4.]

Nothing in the bidding documents indicated that claimants would not be able to prefabricate the reinforcing steel. They had done this in the past on other jobs, and respondent's witness, Alfred Benesch, clearly indicated that it was the contractor's option to prefabricate or not to prefabricate. Benesch said:

"That is optional with the contractor how he wants to place the steel. We just show him the steel itself and we show him the number of bars. We prepare our details, but we do not tell him how to place the bars, individually or with . . . . whether he wants to make it as a cage and place it, that is his business. To what extent, we leave the contractor a free hand." [Tr. 674]

To use prefabricated cages in the larger piers it was essential that the contractor be permitted to pour the stems in stages and that he be permitted to splice the steel together at the construction joints.

Early in June, 1967, claimants contacted the Benesch Company on the subject of construction joints. Benesch wrote the following letter to claimants in reply:

"Gentlemen:

Reference is made to recent discussions between your Mr. Schlumberger and our office regarding construction joints in the piers. We have conferred with the Bureau of Bridges of the State of Illinois and have reached the following decisions:

1. On piers 1 to 5, two construction joints will be permissible between the top of the footing and the bottom of the cantilevered pier head.

2. For piers 6 to 9, only one construction joint will be permissible between top of footing and bottom of pier head.

3. No construction joints will be permitted for piers 10 to 14 between top of footing and bottom of pier head.

4. All reinforcing bars will be detailed accordingly on our drawings.

5. All construction joints including the one at the bottom of the pier head are optional. No objection will be raised if the entire pier is poured in one continuous operation." [Cl. Ex. 21]

Claimants interpreted ¶4 of the above letter to mean that the drawings would show the reinforcing bars being spliced at the construction joints. [T. 65-68].

The initial drawings claimants received for piers 1 and 7 and the first "final" or approved drawings showed the construction joints and splicings exactly as claimants had anticipated. Claimants sent the drawings to the steel supplier who, in turn, proceeded to fabricate and ship the reinforcing steel. Some of the steel arrived on the job within about two weeks, and claimants started to pre-fabricate the cages.

Then, on August 31, 1967, the claimants received verbal notification from respondent that the August 17, 1967, drawings for pier 1 and the August 10, 1967, drawings for pier 7 were not "final" drawings, and to stop all work on those piers as far as the drawings were concerned. Thereupon, claimants notified their resteel supplier not to ship any more steel on these drawings and stopped assembly of the steel that they had already received. [T. 82-84]. As we discussed earlier in this opinion, the delay in getting final drawings did not *per se* damage the contractor. Although he had started prefab-

rication of steel and actually ended up having to tear it apart in orjer to use it, he was so far behind in his cofferdam work that he could not have installed the steel in August, 1967, even if the plans had not been changed. The prefabricated steel would have had to remain on the banks of the river while he continued to struggle with the cofferdams.

On October 2, 1967, the contractor received radically revised drawings that made prefabrication impossible. This was due to the fact that in July or August, 1967, through the intervention of the Federal government, Benesch and Company abandoned the design criteria they had been using up to that point, and substituted another. This matter is fully and accurately explained by claimants in pages 9 through 14 of the "Statement of Facts" Section of their brief.

As a result of respondent's changing from the design criteria of the "American Association of Highway Officials" [AAHO] to that of the "Bureau of Public Roads Ultimate Design" [BPRUD] after the execution of the contract, the Court must decide the following question: Did this change constitute an increase in the quantity of the work to be performed "of *such magnitude* as to constitute a substantial or material variation in the *original contract*" so that contract unit price payments are no longer the proper measure of damages?

We find that determining the *magnitude* of the change is comparatively simple. The exhibits in the record show without dispute that the quantity of reinforcing steel rose from 1,200,000 pounds as originally estimated by the State in the bidding documents [Cl. Ex. 4] to 1,449,630 pounds final quantity [Resp. Ex. 1]. Almost all of the increase was in the stems of piers 1 through 7 and also in the footings. For example, the

number of tie bars in pier 7 was increased by 774%. [Cl. Ex. 62; T. 720, 721, 724, 1031]. These figures represent substantial and dramatic increases in the quantity of the work to be performed.

Yet, to answer our question affirmatively, these changes, however great the magnitude, must amount to a change in the *original contract.* But, what was the *original contract?*

If final drawings using AAHO design criteria had been furnished the bidders at the time the project was let for bids, the subsequent switch to BPRUD criteria and resulting in revision of the drawings would, without a doubt, have been a change in the *original contract.* Or, on the other hand, if at the time of the bidding respondent had issued final drawings using BPRUD criteria, there would have been no change in the original contract at all, and the bidders would have known from the outset that prefabrication, for example, was not possible.

The legal problem here centers about the fact that the contract was signed *without* final drawings. So, the question remains as to just what the *original contract* was.

A radical answer, [mentioned later in our comments on an analogous case, *Snead & Co. Iron Works* v. *Trust Co., et al.*, (1907) 225 Ill. 443] would be that, because of the absence of final drawings, there was no contract, or that the contract was void for want of mutuality.

A less radical answer, which we believe is sustained by the preponderance of the evidence, is that the contract was entered into on the basis of AAHO criteria. This is the only reasonable conclusion based on the following 4 significant aspects of the evidence in the record:

(1) The State's original estimate that 1,200,000 pounds of reinforcing steel would be required, is an estimate consistent with AAHO standards, but inconsistent with the 1,449,630 pounds finally used as a result of final drawings being prepared using BPRUD criteria.

(2) The drawings issued prior to August 31, 1967, were consistent with AAHO specifications and with claimants' assumption that they would be able to prefabricate the steel and splice at the construction joints.

(3) The following testimony of William Hoeltje, vice president of Alfred Benesch and Company, the State's design engineer:

"We did no study to indicate where the additional 23 pounds of steel per cubic yard occurred, or where the increase occurred, but a good portion of the increase in steel was from the additional bars that were added in the footing by the Bureau of Public Roads. Another portion of it, of course, would come from the steel that was added due to the revision caused by the ambiguity in the AAHO's specifications. *The estimate was made at the time we were still designing all piers under the AAHO specifications. Our original design was based under the AAHO's specifications. Under the AAHO specifications the vertical reinforcing steel is spliced at the construction joints as a requirement of AAHO.*" [Vol. III Abstract. T. 624]

"Under the AAHO design criteria, it is normal practice to have the vertical steel on piers of this type spliced or lapped at construction joints. The preliminary bid plans did not show any construction joints. The Contractor asked that he be able to place construction joints at various locations. We gave him permission. This was contained in Alfred Benesch's letter dated June 26, 1967, which is Ex. 21. *Subsequent to June 26, 1967, because of the direction of the Bureau of Public Roads and the determination that the AAHO specifications were inadequate, Alfred Benesch and Company had to change the design in respect to the lapping of the steel at the construction joints.*" [Vol. III Abst. of T. 625]

"Insofar as we had originally contemplated the design under the AAHO specifications and rejected it as inadequate and utilized the BPRUD specifications, there was a design change." [Vol. III Abstract of T. 626].

"The Bureau of Public Roads brought the change in the footings to the attention of Alfred Benesch and Company. *We then recognized the need in our judgment not to rely on the design criteria of the AAHO specification. We decided to change to the BPR specification.* The Bureau of Public Roads called our attention to the need for a design change in the footings." [Vol. III Abst. T. 652].

(4) Finally, the admission of the State's design engineer that Benesch did not learn about the BPR Ultimate Design pamphlet until July or August of 1967. Mr. Hoeltze said:

"I first became aware of the U.S. Department of Commerce pamphlet 'Ultimate Design' in approximately July or August of 1967." [Vol. III Abst. T. 654].

The Court finds that the preponderance of the evidence supports our conclusion that the switch from AAHO to BPR Ultimate Design was "a change of such magnitude as to constitute a substantial or material variation in the original contract."

The earlier decisions of this court and the reviewing courts, cited by claimants and respondent, are not decisive of the issues here presented. However, we find that *Snead & Co. Iron Works* v. *Trust Co., et al.,* (1907) 225 Ill. 442, not cited by either party, presents some interesting analogies. From the Supreme Court's opinion at page 448:

"In 1892, Marshall Field was having erected what may be termed the Wabash Avenue Annex to his retail store in Chicago, D. H. Burnham being employed as architect and superintendent. Bids were requested for the ornamental iron work and [the contractor, Snead] submitted one for $88,643, which being the lowest bid was accepted. The next lowest bid was for $135,000 . . . William R. Snead, general manager for the [contractor] signed the contract in duplicate, as well as a series of scale drawings which had been prepared by the architect, *showing only in a general way the design and character of the iron work.* It appears that there were in the architect's office, from the time the bids were called for the time the contracts were signed, certain photographs of fine ornamental iron work made in Europe and a specimen of grille work executed by Winslow Bros. Company, iron workers of Chicago. It was controverted as to whether the grille work and photographs were presented to Mr. Snead before he signed the contract. He insists that he first saw them after he had signed the contract, when the photographs were presented to him for signature and he refused to sign them . . ."

The two cases are clearly analogous. The contract for the ornamental iron work on Marshall Field's Wabash Avenue store was let without final drawings. Thereupon,

the contractor, wanting to make certain that the work to be done was going to be compatible with the assumptions he entertained when he submitted his bid and signed the contract, sent a follow-up letter to Architect Burnham [Benesch's counterpart here] to clarify certain points [exactly as claimants here contacted Benesch to get assurance that the piers would have construction joints]. As the work progressed on Marshall Field's store, Burnham's final drawings, [like Benesch's here] turned out to be not what the contractor had in mind when he signed the contract. The Supreme Court continued at page 450:

"Shortly after the original draft of the contract had been signed by Field, [contractor] entered upon the performance of the contract and furnished the balustrades and elevator screens in accordance with full-sized detail drawings thereafter furnished him by Burnham, protesting, from time to time, however, that the character of the work was more elaborate than the contract contemplated, and that it was not covered by the contract and for that reason should be regarded as extra work. The ornamental features consisted of leaves, buds, fruits, vines and various artistic figures which were not indicated by the scale drawings, and some of which necessitated hand work by skilled iron workers."

Mr. Burnham and Marshall Field did not want to pay *anything* for the additional iron work. In the case at bar, the State has paid for the extra steel, but does not want to pay for the additional labor and equipment needed to install the steel. To that extent the fact situations with respect to the nature and amounts of damages claimed are different, but the language of the Supreme Court at page 452 is pertinent to both situations:

"It is contended by the [Field's Architect] that the scale drawings themselves are not definite and certain, and that under the contract the architect has the power to determine the true construction and meaning thereof; and further, that the architect did determine the meaning of the scale drawings and furnished the detail drawings in accordance with such determination, and that the ambiguity in the contract is thereby cured. In that view of the matter the contract was not only ambiguous, but it was blank and meant nothing so far as it was evidenced by the scale drawings. *The difficulty about this contention is, that with the scale drawings in the condition they were when the original draft of the contract was signed by Snead, no one could tell what was*

*required, and if that was to be ascertained some months later by the architect, and he had the power to required screens and balustrades that would be of the value of $20,000 or that might exceed $50,000 in value, without any increase or decrease in the contract price for all the iron work, there was no meeting of the minds of the parties and the contract was void for that reason."*

The Supreme Court did not hold to this radical outcome, however, and held that Mr. Snead's letter was part of the contract so that the ornamental work as ordered by Burnham became extra work to be paid for over and above the amount specified in the original contract.

This is tantamount to holding that the letter from Benesch and Company and the interpretation claimants placed on ¶4 thereof, is to be considered as part of the *original* contract, thus holding that the original contract expressly provided for construction joints and splicing at the joints.

However, it is not necessary to strain for a construction that would incorporate claimants' Exhibit 21 into the contract. Mr. Hoeltje's testimony as previously cited, the quantity of steel shown by the State in the bidding documents, and the drawings issued prior to August 31, 1967, all show that the original contract was based on AAHO specifications, and that the shift to BPR Ultimate Design was, in fact, a material change in the *original contract.*

B. Changing the size of the footings for the piers from two, as shown in the original plans, to give in the construction drawings.

1. Necessitating an increase in the size of the cofferdams.

2. Requiring more seal coat.

3. Causing monetary damages in the amount of $41,793.59.

Claimants' argument here is that the original drawings indicated that there would be only two size footings for the fourteen piers so that only two sizes of cofferdams would be needed. The final plans showed footings of various sizes, depending on the height of the pier, and claimants argue that this caused them to build larger cofferdams and use more seal coat.

Respondent, in pages 31 through 36 of its brief, demonstrates convincingly that claimants had ample clues from the preliminary drawings to know that there would be more than two sizes of footings, and that using the preliminary drawings he could have computed their approximate sizes.

In view of the length of this opinion, necessitated by a voluminous record which includes 1044 pages of transcript, abstracted by the claimants in 4 volumes, plus reams of charts, photos and exhibits, we will briefly summarize our conclusions as follows:

*Right-of-way delay:* The manifest weight of the evidence is that claimants were not delayed in performing the contract and suffered no damages because of the State's delay in acquiring access to the Forbeck property.

*Drawings delay:* Except for a short delay in connection with pier 7 [expressly waived by claimants in their brief. Statement of Facts Section, Page 25], claimants were not delayed in performing their contract, and suffered no damages because of the State's delay in furnishing revised final drawings.

*Acceleration damages:* As of November 1, 1967, when claimants acceded to the State's demand for acceleration, they were not entitled to time extensions for right-of-way delay or drawings delay. Because of lack of needed equipment and other problems, they were

seriously behind in their own schedule, and the State was justified in demanding acceleration. Claimants' argument that they should have been given extensions through September 30, 1968, to finish the job is without merit.

*Design change:* Claimants are entitled to damages for the design changes imposed by respondent, and the damage figures are discussed below.

*Changing the size of the footings:* At the time of preparing their bid, claimants had sufficient information to know that, because the piers were of varying heights, there would be more than two footing sizes. Any loss suffered by claimants in enlarging its cofferdams arose from their failure to calculate the size of the footings from the information available in the bidding documents.

*Dewatering damage:* With respect to the claim for dewatering damages, both sets of claimants' figures are *estimates.* As pointed out by respondent there is no way to make proper allowance for the portion of the dewatering expenses chargeable to claimants' own problems with respect to the cofferdams [Respondent's Brief 69-70]. Claimants' claim for dewatering damages must be denied.

*Retainage by the State:* This claim is not in dispute. Claimants are entitled to be paid the amount admittedly due when controversies are settled.

Before translating these conclusions into an award in the amount we find to be due the claimants, the court wishes to point out that claimants have been paid the entire amount agreed to in the original contract. Claimants' bid for the job was $2,342,186 and they have been paid to date $2,522,618.32 [less the retainage of

$25,214.56 which is admittedly owed to the claimants].
The additional $155,217.76, which has been paid was in
accordance with the original contract, being a unit price
contract under which claimants were paid 17 cents per
pound for all steel used and contemplated that the
quantities of materials actually used might be more or
less than the original estimates. In this case it was more.
While the price of 17 cents per pound included labor
costs, it did not contemplate the additional labor required
by the State's changes in specifications which made pre-
fabrication of steel cages impossible and amounted to a
substantial variation in the original contract.

Claimants compute their claim for damages in-
curred as a result of the change from AAHO specifica-
tions to BPR Ultimate Design by subtracting an *esti-
mated* figure as to what the job would have cost if built
according to AAHO from the *actual* cost incurred under
BPR Ultimate Design.

There is no problem in connection with the *actual*
cost figures. Claimants had cartons of records which they
offered to introduce into evidence to support their costs,
and respondent does not challenge the accuracy of these
figures. Respondent states in its brief at page 65:

"With regard to answering the claimants' brief on damages, the respond-
ent would reply that, insofar as the records of claimants are concerned, we do
not question the records as they reflect the cost of constructing the substruc-
ture. We do question the reason for these costs being so high and we challenge
the claimants' efforts to attribute the high costs to any wrong doing on the part
of the State . . .

"For the respondent to challenge the daily records kept by the claimants
would be like the claimants challenging the daily records kept by the resident
engineers as reflected by the diaries submitted into evidence, which they,
understandably, never challenged."

The problem with *estimated figures* is always less
certain. However, as claimants point out, this Court in
*Cassidy* v. *State of Illinois*, 24 C.C.R. 419, accepted the

method of subtracting *estimated* costs from *actual* costs as proof of damages. Although recognizing the problems presented, this Court said in *Cassidy* at page 427:

"Page 7 of Exhibit No. 3 indicates the actual hours of labor performed by each trade. Claimants then include an estimated number of hours which should have been the hours required had the job been completed on time . . . A difficulty facing this Court is the use of claimants' figures as proof of damages. The figure of 6,880 estimated hours for masonry could be entirely self serving . . .

"The Attorney General did not question the figure, nor offer any proofs to the contrary, and did not object to the exhibit being offered into evidence."

In the case at bar, the Attorney General did object to the admission into evidence of claimants' Exhibit 41 which embodies claimants' estimates in written form. However, in our opinion, the objection was properly overruled.

The said claimants' Exhibit 41, RAC-1 through RAC-4, "Request for Additional Compensation", had been previously submitted to the State by the claimants on December 20, 1968, as part of their continuing effort to persuade the State to recognize the contractor's claims for additional compensation. The respondent thus had ample time to study this exhibit in advance, prepare an appropriate answer, and bring in an expert witness of its own if it wishes to challenge claimants' estimated figures in the exhibit.

This said exhibit is divided into 4 parts. We are not here concerned with parts 2, 3 and 4, because they deal with the alleged damages claimed to have been sustained from changes in the cofferdam sizes; acceleration directives; drawing delays; and right-of-way delay; all of which we have previously discussed and found to be without sufficient merit to support these claims.

We are here concerned only with RAC-1, which undertakes to set forth the monetary damages resulting

from the change from AAHO to BPR Ultimate Design. We concede that the exhibit, standing alone, unsupported by competent testimony, could be purely self serving. However, for the purpose of this record, it functions only as a convenient summary of the detailed supporting testimony of Mr. Fideles Wolf, the contractor's chief engineer. Mr. Wolf's testimony supporting the figures in the exhibit, found on pages 177 through 260 of the record, stands unrefuted.

In the State's cross examination of Mr. Wolf, found on pages 337 through 477 of the record, we find that no portion of this cross examination is directed specifically to attacking, exploring, or questioning in any way Mr. Wolf's *estimated* figures. Nor did the State call an expert of its own to attack the estimated figures as we previously mentioned.

However, we find that claimants are in error in disregarding the actual cost of the steel in computing these damages arising from additional costs of reinforcing steel placement. On page 362 of the transcript, it appears that claimants paid $92,818.73 for the 1,449.630 pounds used. The steel, therefore, cost claimants $.064 per pound. Hence the quantity initially estimated by the State, 1,200,000 pounds, would have cost $76,800.00. Accordingly, claimants' method of computing damages must be altered by including these two figures as follows:

*Estimated figures*

| | |
|---|---|
| $115,149.31 | total cost w/o material |
| 76,800.00 | estimated vaterial cost |
| | |
| $191,949.31 | total estimated cost |
| $204,000.00 | bid price on steel |

–191,949.31 estimated cost

$ 12,050.69 estimated profit

*Actual figures*

$219,329.57 cost w/o material
 92,818.73 cost of material used

$312,148.30 total actual cost

–246,437.10 actual payment by State

$ 65,711.20 actual loss

$ 12,050.69 estimated profit
 65,711.20 actual loss

$ 77,761.89 total loss from placement of additional
steel

With respect to claimants' claim for $64,025.35 additional costs of Class X concrete placement, no problem arises with respect to the cost of the concrete and the amount used, because the estimated amount and the "as built" amount are practically the same. [Resp. Ex. 1]. The contractor's claim should be reduced, however, by the additional $13,324.17 already paid to claimants for Class X concrete over the bid price.

In conclusion, the Court finds that the shift from AAHO specifications to BPR Ultimate Design was a subtantial variation in the original contract, and that claimants have proven damages arising therefrom in the following amounts:

$ 77,761.89 loss from placement of additional steel as a result of design changes.

50,701.18 additional expenses arising from placement of Class X concrete as a result of design change.

$128,463.07 total damages resulting to claimants from design changes.

25,214.56 retainage withheld by the State which is due the claimants

$153,677.63 total amount due the claimants.

Claimants are, therefore, hereby awarded additional payment for extra services rendered pursuant to substantial variations made by the State in the original contract, in the total sum of $153,677.63 [One hundred fifty three thousand, Six hundred seventy-seven dollars and sixty-three cents].